## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCOTT HANLON | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 19-3859 |
| PRECISION METAL SERVICES, INC. | : | |

### MEMORANDUM

**SURRICK, J.**                                                         **JANUARY 31, 2024**

      This employment discrimination case arises out of Plaintiff Scott Hanlon's former

employment with Defendant Precision Metal Services, Inc.  In his four-count Amended

Complaint, Plaintiff asserts claims against Defendant for violations of the Americans with

Disabilities Act ("the ADA"), 42 U.S.C. § 12101, *et seq*., and the Pennsylvania Human Relations

Act ("the PHRA"), 43 Pa. Cons. Stat. § 951, *et seq*.  Specifically, Plaintiff alleges claims of

disability discrimination, failure to accommodate, and failure to engage in the interactive process

(Counts I & III) and retaliation (Counts II & IV).  Presently before the Court is Defendant's

Motion for Summary Judgment.  (Mot., ECF Nos. 14, 14-1.)  For the following reasons,

Defendant's Motion will be denied.

## I.      BACKGROUND[1]

      Since 2003 or 2004, Plaintiff has suffered from a herniated disc in his back.  (Plf.'s Dep.

at 20; September 14, 2016, Rothman appointment summary.)  Plaintiff initially attempted to treat

his herniated disc with physical therapy, epidural injections, acupuncture, and medication.

---

[1] We view the facts and reasonable inferences therefrom in the light most favorable to
Plaintiff as the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

(Plf.'s Dep. at 21; September 14, 2016, Rothman appointment summary.)  Despite these

treatments, the herniated disc caused Plaintiff to experience pain.  (Plf.'s Dep. at 21; September

14, 2016, Rothman appointment summary.)  Because of the pain, Plaintiff sometimes

experienced difficulty getting out of bed.  (Plf.'s Dep. at 21.)  On some days, Plaintiff could not

even get out of bed.  (*Id*.)  Although the pain would subside for weeks at a time, it would always

resurface.  (*Id*. at 21-22.)  Plaintiff decided to stop exercising at the gym, skiing, snowboarding,

and playing basketball and soccer.  (*Id*. at 22-23.)  At the time, Plaintiff was working for an

automotive wholesale parts distributor.  (*Id*. at 13.)  In spite of the pain, Plaintiff pressed on at

work.  (*Id*. at 23.)  According to Plaintiff, "I had to work.  There was no choice.  I still got up.  If

it was Monday through Friday and it hurt, it hurt.  I got up, did my job, did what I had to do, and

go home."  (*Id*.)

      Defendant is a distributor of steel.  (*Id*. at 19; Morgan Dep. at 14.)  In April of 2010,

Plaintiff applied for an open position as a full-time Warehouse Worker at Defendant's

warehouse.  (Plf.'s Dep. at 17-18; Payton III Dep. at 10-11.)  Plaintiff interviewed for the

position with Raymond Coniglio, Vice President of Operations.  (Plf.'s Dep. at 17; Payton III

Dep. at 10-11; Coniglio Dep. at 8.)  Coniglio hired Plaintiff.  (Payton III Dep. at 10-11; Plf.'s

Dep. at 17; Coniglio Dep. at 11.)  As an employee of Defendant, Plaintiff would receive a 401(k)

with employer match, health and dental benefits, disability and life insurance, and an annual

salary with the opportunity to receive quarterly and end-of-the-year bonuses.  (Plf.'s Dep. at 133-

34; Morgan Dep. at 42-44.)  Plaintiff's position as a Warehouse Worker for Defendant involved

operating a forklift to bring metal coils from trucks into the warehouse, coating coils, pulling

orders for shipment, and loading coils onto trucks for shipment, as well as managing inventory

and general maintenance.  (Plf.'s Dep. at 18; Hughes Dep. at 34; Morgan Dep. at 26; Voisine

Dep. at 28-29.)  Plaintiff's schedule was forty hours per week, Monday through Friday from 8:00 a.m. to 4:30 p.m.  (Plf.'s Dep. at 47, 110, 117.)  Plaintiff's supervisor was the Warehouse Manager, Joseph Voisine.  (*Id*. at 19-20; Coniglio Dep. at 10-11; Voisine Dep. at 12.)  Voisine also supervised the other full-time Warehouse Workers, Michael Zack and Elvis Fernandez, and the part-time Warehouse Worker, Caesar Martinez, Jr.  (Voisine Dep. at 26-27; Zack Aff., ¶¶ 2-3; Fernandez Aff., ¶ 2; Coniglio Dep. at 10-11; Morgan Dep. at 12-13; Plf.'s Dep. at 81.)

Per his job duties, Plaintiff sat in the forklift about six or seven hours each day.  (Plf.'s Dep. at 47-48.)  The forklift had a flat seat and the floor of the warehouse was rough and uneven due to potholes.  (*Id*. at 24, 26; Zack Aff., ¶¶ 8, 10.)  The flat seat and rough floor aggravated Plaintiff's herniated disc, causing him to experience pain from operating the forklift.  (Plf.'s Dep. at 24, 26.)  Plaintiff believed that a suspension seat that moved up and down in the forklift would alleviate his pain.  (*Id*. at 24, 26, 28, 29.)  The price of a suspension seat from the supplier PA Industrial was $349.99.  (*Id*. at 28, 31.)  Plaintiff continued to perform his job duties without the suspension seat.  (*Id*. at 25.)

Per his job duties, Plaintiff also sat at a desk for about one or two hours each day to process customer orders.  (*Id*. at 46-47.)  The desk's office chair was flat.  (*Id*. at 123.)  The flat chair aggravated Plaintiff's herniated disc, causing him to experience pain from sitting at the desk.  Plaintiff believed that an office chair with lumbar support would alleviate his pain.  (*Id*. at 46-47, 52, 55.)  For about five years, Plaintiff continued to perform his job duties without the office chair with lumbar support.  Then, one day, in Defendant's trash, Plaintiff found a broken office chair with lumbar support.  (*Id*. at 122-23.)  Plaintiff repaired the chair and began using it at the desk to alleviate his pain.  (*Id*. at 122-23.)  Plaintiff could not afford to purchase a new office chair.  (*Id*. at 123-24.)

Defendant did not have a formal human resources department.  (Morgan Dep. at 10.)  The Chief Financial Officer, David Morgan, was responsible for human relations, payroll, employee benefits, and tracking employee attendance.  (*Id*. at 8- 9.)  Defendant had a system for logging attendance on the computer through Outlook.  (Payton III Dep. at 45-46.)  Plaintiff was entitled to twenty days of paid time off ("PTO") per year.  PTO was to be used for time off for any reason.  (Morgan Dep. at 28-29; Plf.'s Dep. at 51.)  If Plaintiff took PTO, other employees would have to pitch in at the warehouse to compensate for his absence.  (Voisine Dep. at 20, 44-45.)  Defendant employed only about fifteen employees.  (Morgan Dep. at 9; Payton III Dep. at 9.)  Plaintiff was also entitled to a thirty-minute lunch break.  (Plf.'s Dep. at 93, 108; Morgan Dep. at 47-48.)

Defendant had an employee performance review process that was conducted at the end of each calendar year.  Each employee wrote his or her own performance review, submitted it to the management team, and then met individually with Coniglio; Morgan; President and Owner, Martin J. Payton, III ("Payton III"); and Vice President of Sales and Technical, Kevin Hughes. (Plf.'s Dep. at 32-33; Payton III Dep. at 8-9, 15; Hughes Dep. at 8-9; Coniglio Dep. at 18-19; Morgan Dep. at 21-23.)  Morgan would handwrite notes on the employee's performance review and keep it in his files.  (Morgan Dep. at 23; *see also* Plf.'s 2010 - 2017 performance reviews.)

Plaintiff's herniated disc and resulting pain progressively worsened over the years. (Plf.'s Dep. at 37.)  Some mornings, his wife had to put on his socks for him.   At times, Plaintiff could not even get out of bed to report to work.  (*Id*. at 57.)  In spite of the pain, Plaintiff pressed on and performed his job duties as a Warehouse Worker in Defendant's warehouse.  (*Id*. at 57-58.)  Plaintiff continued under the care of his primary care physician and he consulted with

specialists.  (*Id*. at 38-41.)  Plaintiff would occasionally take time off from work to attend these appointments or pick up prescriptions.  (*Id*. at 54.)

Because of "horror stories online," Plaintiff was fearful of surgery.  (*Id*. at 61.)  Plaintiff tried various treatments for his pain, holding off on surgery as the last resort.  (*Id*. at 38-41; September 14, 2016, Rothman appointment summary.)  For example, in October of 2013, Plaintiff tried epidural injections for his back pain.  (Plf.'s Dep. at 39; October 2013 email chain.)  Plaintiff also tried a new pain medication, tramadol, which caused him to experience a seizure and miss work for one week.  (Plf.'s Dep. at 57-58; September 14, 2016, Rothman appointment summary.)

Eventually, Plaintiff had exhausted all other options and his pain was too much to bear. (Plf.'s Dep. at 40.)  Finally, at an appointment at the Rothman Institute Spinal Clinic on September 14, 2016, after weighing the benefits and the risks, Plaintiff agreed to surgery.  (*Id*. at 56-57; September 14, 2016, Rothman appointment summary.)

At his 2016 annual performance review meeting, Plaintiff informed Coniglio, Morgan, Payton III, and Hughes of his upcoming surgery and he requested a leave of absence of a couple of months.  (Coniglio Dep. at 24-25; Hughes Dep. at 18; Payton III Dep. at 27; Morgan Dep. at 35-36; Plf.'s Dep. at 60-62.)  Defendant's management team granted Plaintiff's request.  (Plf.'s Dep. at 63-66.)  Afterward, there was a meeting between Hughes, Coniglio, and Voisine to discuss Plaintiff's surgery and how to manage operations in his absence.  (Voisine Dep. at 33; Coniglio Dep. at 26; Hughes Dep. at 21.)  Plaintiff's leave of absence fell during the busy first quarter for Defendant.  (Coniglio Dep. at 26.)  A couple of temporary workers were hired, but they were terminated after a couple of weeks due to performance issues.  (Voisine Dep. at 33; Coniglio Dep. at 27-29; Payton III Dep. at 28-29; Morgan Dep. at 38.)  Thus, during Plaintiff's

post-surgery leave of absence, warehouse employees had to work extra hours and even some office employees had to help out in the warehouse. (Coniglio Dep. at 26-27; Voisine Dep. at 34-36; Morgan Dep. at 39.) For example, Coniglio and Hughes pitched in coating coils. (Coniglio Dep. at 28.) Also, Coniglio's wife, who was an office employee at the time, helped in the warehouse until she broke her leg. (*Id*. at 27, 29.)

In January of 2017, Plaintiff had a lumbar microdiscectomy at Rothman. (Plf.'s Dep. at 39, 41, 44, 61-62; January 24, 2017, Progress Note at Collegeville Family Practice.) Two months later, in March of 2017, Plaintiff reported to Defendant's warehouse to begin working again. (Plf.'s Dep. at 65.) According to Plaintiff, "I wanted to get back to work. I was going stir crazy. That's why I went in." (*Id*. at 70.) However, Plaintiff did not have clearance from his physician at that time. Defendant's management team directed Plaintiff to remain on medical leave until his physician cleared him to return to work full duty without restrictions. (*Id*. at 65-70; Payton III Dep. at 31; Coniglio Dep. at 28-29; Voisine Dep. at 35; Hughes Dep. at 22-26; Morgan Dep. at 40.)

On April 10, 2017, Plaintiff returned to Defendant's warehouse with his physician's clearance to return to work full duty without restrictions. (Plf.'s Dep. at 67, 70-71; April 5, 2017, note from Rothman physician; Hughes Dep. at 22-26; Morgan Dep. at 38; Coniglio Dep. at 29.) Plaintiff retained his job title, job duties, benefits, and pay. (Plf.'s Dep. at 71, 78.)

After returning from his post-surgery leave of absence, Plaintiff took time off to attend physical therapy sessions. (*Id*. at 41-42, 71-72; Voisine Dep. at 45.) His physician had directed him to complete three sessions of physical therapy per week for six weeks. (Plf.'s Dep. at 72; March 30, 2017 through May 17, 2017, NovaCare Rehabilitation appointment summaries.) Plaintiff's physical therapy goals were: "get back to work, pain to go away." (April 4, 2017,

NovaCare Rehabilitation appointment summary.)   Unfortunately, Plaintiff had to discontinue the physical therapy sessions early in May because he could not afford the $60 co-pay required for each session.  (Plf.'s Dep. at 42, 72; May 17, 2017, NovaCare Rehabilitation appointment summary.)  Plaintiff continued to do physical therapy exercises at home.  (Plf.'s Dep. at 72-73.)

Plaintiff felt worse after the surgery.  (*Id*. at 73; February 21, 2017, Progress Note at Collegeville Family Practice.)  According to Plaintiff, he started to experience "screaming, shooting pains down [his right] leg and [his right] foot."  (Plf.'s Dep. at 73; *see also* February 21, 2017, Progress Note at Collegeville Family Practice.)  Sometimes, Plaintiff would also experience numbness in his right leg and foot.  (Plf.'s Dep. at 73.)  An accumulation of scar tissue from the surgery had affected Plaintiff's sciatic nerve.  (*Id*.; March 8, 2017, MRI; March 30, 2017 through May 17, 2017 NovaCare Rehabilitation appointment summaries; February 21, 2017 through December 5, 2017 Progress Notes at Collegeville Family Practice.)  As a result, Plaintiff took time off from work to attend medical appointments and pick up prescriptions. (Plf.'s Dep. at 71-72; Payton III Dep. at 46; Morgan Dep. at 68-69; Voisine Dep. at 63.)

In spite of the pain, Plaintiff continued to perform his job duties at Defendant's warehouse because he needed to keep earning a salary.  (Plf.'s Dep. at 74-75.)  According to Plaintiff, "I had to.  I had bills.  I needed to make a paycheck."  (*Id*. at 74.)  Plaintiff continued to experience pain from operating the forklift.  (*Id*.; March 30, 2017 through May 17, 2017 NovaCare Rehabilitation appointment summaries.)  Plaintiff still believed that a suspension seat would alleviate his pain.  (Plf.'s Dep. at 74-75.)  Plaintiff could not afford to purchase a suspension seat himself.  (*Id*. at 124.)

In June of 2017, Defendant hired a new full-time Warehouse Worker named Hector Rodriguez.  (Rodriguez Aff., ¶ 2; Plf.'s Dep. at 79; Hughes Dep. at 15; Coniglio Dep. at 33;

Morgan Dep. at 13; Voisine Dep. at 13, 39; Payton III Dep. at 39-41.)  About three months later, in September of 2017, Rodriguez was promoted to the position of Warehouse Manager.  (Plf.'s Dep. at 79-80; Rodriguez Aff., ¶ 4; Payton III Dep. at 39-41; Morgan Dep. at 13; Hughes Dep. at 16-17.)  Plaintiff and the other full-time Warehouse Workers, Zack and Fernandez, and the part-time Warehouse Worker, Martinez, now reported to Rodriguez.  (Plf.'s Dep. at 80-81; Zack Aff., ¶ 3; Rodriguez Aff., ¶ 4; Voisine Dep. at 15.)  Voisine was promoted to Director of Importation and Logistics.  (Voisine Dep. at 13-14.)  Rodriguez reported to Voisine.  (*Id*. at 15.)  In October of 2017, the management team addressed various concerns with Plaintiff and other Warehouse Workers about behavior and attendance.  (Plf.'s Dep. at 114-15, 117; Rodriguez Aff., ¶ 9; Morgan Dep. at 73-74; Voisine Dep. at 46-47.)

On December 12, 2017, at Plaintiff's 2017 annual performance review meeting, the management team accused Plaintiff of a number of behavioral and attendance infractions. (Payton III Dep. at 13-14, 47-48; Hughes Dep. at 28-29; Coniglio Dep. at 39-40; Morgan Dep. at 47, 63; Plf.'s Dep. at 92-102.)  The management team also accused Plaintiff of being the cause of interpersonal issues occurring among the Warehouse Workers.  Plaintiff denied having committed any infraction and he denied playing a role in the warehouse drama.  (Plf.'s Dep. at 92-102; Payton III Dep. at 47-48; Coniglio Dep. at 42; Hughes Dep. at 29; Morgan Dep. at 63.) After this meeting, as requested by the other members of Defendant's management team, Voisine compiled a list of all Plaintiff's alleged infractions.  (2017 Scott issues list; Payton III Dep. at 49-50; Coniglio Dep. at 40-41; Morgan Dep. at 78-79; Voisine Dep. at 54-55.)

Two days later, Plaintiff attended another meeting with the management team.  The management team raised the same concerns.  (Plf.'s Dep. at 117-19; Coniglio Dep. at 44-45; Morgan Dep. at 61.)  The management team presented Plaintiff with Voisine's list.  (Coniglio

Dep. at 45; Payton III Dep. at 50.)  Plaintiff again denied the alleged infractions and he denied

playing a role in the warehouse drama.  (Payton III Dep. at 55; Coniglio Dep. at 46; Morgan

Dep. at 63.)  At the meeting, Payton III terminated Plaintiff's employment.  (Payton III Dep. at

56; Morgan Dep. at 81-82; Plf.'s Dep. at 119.)  According to Plaintiff, it was one of the worst

days of his life and he cried.  (Plf.'s Dep. at 120; Coniglio Dep. at 47; Payton III Dep. at 56;

Morgan Dep. at 66.)  Although his termination has affected him emotionally, Plaintiff cannot

afford to see a counselor.  (Plf.'s Dep 146-48.)

From December of 2017 through October of 2018, Plaintiff was unemployed.  (*Id*. at

132.)  Plaintiff applied for unemployment compensation benefits.  (*Id*. at 130-31.)  Defendant

contested.  (Morgan's February 6, 2018, letter to Unemployment Office; Plf.'s Dep. at 129;

Morgan Dep. at 71-72.)  Plaintiff took out his 401(k) and used his credit card to pay bills until

his unemployment compensation benefits came through.  (Plf.'s Dep. at 141-42.)

In October of 2018, Plaintiff attained a temporary position with the parts warehouse at

Wolfington Body Company, a bus distributor.  (*Id*. at 130-31, 137.)  After three months,

Plaintiff's temporary position transitioned into a permanent position.  (*Id*. at 130-32.)  Plaintiff

continues to be employed by Wolfington Body Company.  (*Id*. at 132.)  Plaintiff has not

requested an office chair with lumbar support from his new employer because his job duties do

not require him to sit at a desk for extended periods of time.  (*Id*. at 144.)  Plaintiff has also not

requested a suspension seat for the forklift because he only operates the forklift once a week and

the floor of the warehouse is smooth.  (*Id*. at 145.)

As Plaintiff testified at his deposition, Plaintiff has continued to experience pain.  (*Id*. at

43.)  Plaintiff has continued to see his primary care physician and take medication for his pain.

(*Id*. at 43, 148.)  Plaintiff has continued to do physical therapy exercises at home.  (*Id*. at 72-73.)

As for the other full-time Warehouse Workers, Zack continued to work for Defendant until his resignation in June of 2018, (Zack Aff., ¶ 2; Voisine Dep. at 53; Coniglio Dep. at 14), and Fernandez is still employed by Defendant.  (Coniglio Dep. at 14; Morgan Dep. at 11; Fernandez Aff., ¶ 1.)

## III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248).  "[A] factual dispute is material only if it might affect the outcome of the suit under governing law."  *Id*.  The court must view the evidence in the light most favorable to the non-moving party.  *Galena v. Leone,* 638 F.3d 186, 196 (3d Cir. 2011).  However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment.  *Schaar v. Lehigh Valley Health Servs., Inc*., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)).

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co*., 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of

materials in the record . . ."); *see also Matsushita Elec. Indus. Co., v. Zenith Radio Corp*., 475

U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that

there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole

could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue

for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## IV.   DISCUSSION

We address Plaintiff's claims in the following order: (A) disability discrimination under

the ADA and the PHRA; (B) failure to accommodate and failure to engage in the interactive

process under the ADA and the PHRA; and (C) retaliation under the ADA and the PHRA.

Defendant contends that Plaintiff's "self-serving" deposition testimony is insufficient to

defeat its Motion for Summary Judgment.  (Mot. at 1.)  In ruling on a motion for summary

judgment, "the issue is not whether [the plaintiff] has relied solely on his own testimony to

challenge the [m]otion[], but whether [the plaintiff s] testimony, when juxtaposed with the other

evidence, is sufficient for a rational factfinder to credit [the plaintiff's] testimony, despite its self-

serving nature." *Johnson v. MetLife Bank, NA*, 883 F. Supp. 2d 542, 549 (E.D. Pa. 2012) (citing

*Gonzalez v. Sec'y of Dept. of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012)); *see also Levy v.

UPS*, No. 19-23, 2020 U.S. Dist. LEXIS 27533, at *8 (E.D. Pa. Feb. 18, 2020).  Our analysis of

Plaintiff's claims does not rely on Plaintiff's deposition testimony alone.  Rather, our analysis is

informed by our careful review of the record as a whole.

### A.      Disability Discrimination under the ADA and the PHRA (Counts I and III)

#### 1.     *Prima Facie Case*

The ADA states that "[n]o covered entity shall discriminate against a qualified individual

on the basis of disability in regard to job application procedures, the hiring, advancement, or

discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." [2]  42 U.S.C. § 12112(a).  Courts apply the burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973) to analyze disability discrimination claims under the ADA.  *See*, *e.g.*, *Sampson v. Methacton Sch. Dist.*, 88 F. Supp. 3d 422, 434 (E.D. Pa. 2015) (applying *McDonnell-Douglas* to disability discrimination claim under ADA).  To establish a *prima facie* case of disability discrimination under the ADA, Plaintiff must demonstrate the following three elements: (1) that he is a disabled person within the meaning of the ADA; (2) that he is otherwise qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) that he has suffered an adverse employment action that was the result of discrimination.  *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).  Defendant disputes the first and third elements of a *prima facie* case of disability discrimination.

Once Plaintiff presents a *prima facie* case, the burden shifts to Defendant to proffer a "legitimate, non-discriminatory reason" for Plaintiff's termination.  *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (citation omitted).  If Defendant carries that burden, Plaintiff then must establish that Defendant's proffered reason is a pretext for discrimination.  *Id.*  The *McDonnell*

---

[2] The analogous provision of the PHRA states:

It shall be an unlawful discriminatory practice . . . [f]or any employer because of the . . . disability . . . of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

43 Pa. Cons. Stat. § 955(a).

*Douglas* framework "was 'never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Weldon v. Kraft, Inc*., 896 F.2d 793, 798 (3d Cir. 1990) (quoting *Furnco Constr. Corp. v. Waters*, 438 U. S. 567, 577 (1978)).

Both Plaintiff and Defendant contend that Plaintiff's ADA and PHRA claims can be analyzed together. (Mot. at 14 n.1; Opp'n, ECF No. 16, at 11 n.1.)   The ADA and PHRA are both analyzed under the *McDonnell Douglas* framework. *See Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 142 (3d Cir. 2011).   However, the two statutes define "disabled" slightly differently as the PHRA requires the more stringent interpretation of disability reflected in decisions prior to the ADA Amendments Act of 2008. *See McGlone v. Phila. Gas Works*, No. 15-3262, 2017 U.S. Dist. LEXIS 7963, at *14 (E.D. Pa. Jan. 19, 2017) ("Due to the ADA Amendments Act of 2008 [ ], the definition of 'disabled' under the ADA is more relaxed than it is under the PHRA. . . . [T]his distinction often necessitates a separate analysis under each statute."); *Szarawara v. Cnty. of Montgomery*, No. 12-5714, 2013 U.S. Dist. LEXIS 90386, at *6-7 (E.D. Pa. June 27, 2013) ("The ADAAA relaxed the ADA's standard for disability, . . . but the PHRA has not been similarly amended, necessitating separate analysis of Plaintiff's ADA and PHRA claims.") (internal citations omitted).   "This distinction often necessitates a separate analysis under each statute," but this is not warranted here, because as analyzed below, "a genuine dispute exists as to whether Plaintiff is disabled under the PHRA's more stringent standard," in addition to the ADA standard. *See McGlone v. Phila. Gas Works*, 2017 U.S. Dist. LEXIS 7963, at *14.   As such, our analysis with respect to the ADA applies with equal force to the PHRA. *Id*.

With regard to the first element of a *prima facie* case of disability, a disability under the ADA is defined in three ways: "(A) a physical or mental impairment that substantially limits one

or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).  Plaintiff alleges that Defendant discriminated against him on the basis of all three definitions of disability.  (Opp'n at 11-20.) Defendant argues that Plaintiff has not satisfied any definition of disability under the ADA. (Mot. at 13-17.)  Defendant is mistaken.  Plaintiff has provided sufficient evidence to defeat summary judgment on the issue of whether he had an actual disability under the ADA.

An actual disability under the ADA is "a physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102(1).  "[M]ajor life activities include, but are not limited to: Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1).  "The term '[s]ubstantially limits' shall be construed broadly in favor of expansive coverage."  29 C.F.R. § 1630.2(j)(1)(i).  "'Substantially limits' is not meant to be a demanding standard."  29 C.F.R. § 1630.2(j)(1)(i).  "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  29 C.F.R. § 1630.2(j)(1)(ii).  "The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment 'substantially limits' a major life activity.  Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis."  29 C.F.R. § 1630.2(j)(1)(iii).

Defendant argues that Plaintiff does not have an actual disability because his pain only caused him to "cease certain leisure activities or sports."  (Mot. at 15.)  Defendant is mistaken.

14

Plaintiff testified that prior to his surgery, for over ten years, a herniated disc caused him to intermittently experience severe pain.  (Plf.'s Dep. at 20-23.)  Plaintiff also testified that since his surgery, scar tissue has caused him to experience sharp, shooting pain and numbness in his right leg and foot for at least the last three years.  (*Id*. at 73.)  Although Plaintiff continued to perform his job duties for Defendant in spite of the pain caused by the herniated disc and the scar tissue, the record shows that Plaintiff's pain substantially limited him in the major life activities of standing, bending, walking, and caring for himself.  *See* 42 U.S.C. § 12102(4)(D); 29 C.F.R. § 1630.2(i)(1).  For example, Plaintiff testified that at times he could not get out of bed or put on his own socks because of the pain.  (Plf.'s Dep. at 21, 57.)  Plaintiff also testified that he experienced pain sitting at the desk and operating the forklift in Defendant's warehouse.  (*Id*. at 26, 46-47, 52, 74.)

Moreover, Plaintiff provided medical documentation confirming the herniated disc, the surgery, the scar tissue, and the resulting pain and physical limitations, as well as his attempts to mitigate the pain.  (March 8, 2017, MRI (noting scar tissue); September 14, 2016, Rothman appointment summary, Progress Notes at Collegeville Family Practice (noting herniated disc and 2015 MRI findings), NovaCare Rehabilitation appointment summaries.)  Plaintiff also provided evidence that he had requested time off from work for epidural injections for "terrible back pains" in 2013.  (October 2013 email chain.)  In sum, Plaintiff has provided sufficient evidence to defeat summary judgment on the issue of whether he had an actual disability under the ADA. *See*, *e.g*., *Lindsey v. St. Mary Med. Ctr*., No. 14-4265, 2016 U.S. Dist. LEXIS 29180, at *16-18 (E.D. Pa. Mar. 7, 2016) (concluding that the plaintiff who suffered from a herniated disc and sciatica had offered sufficient evidence to defeat summary judgment on the issue of whether she had an actual disability under the ADA because the plaintiff testified that for years she had

15

experienced low back pain, sciatica down her right leg, and difficulty bending, standing, sitting,

and lifting, and plaintiff provided a corroborative note from her physician); *Hammel v. Soar*

*Corp.*, No. 14-3106, 2015 U.S. Dist. LEXIS 14361, at *9 (E.D. Pa. Feb. 6, 2015) (finding that

the plaintiff had presented sufficient evidence to defeat summary judgment on the issue of

whether she had an actual disability under the ADA where the plaintiff had testified that she

experienced pain in her back and down her leg and that her back issues impacted her ability to

walk, stand, sit, and lift, and the plaintiff provided medical documentation of a steroid injection

contemporaneous with the adverse employment action); *Mills v. Temple Univ.*, 869 F. Supp. 2d

609, 621-22 (E.D. Pa. 2012) (finding that the plaintiff had presented sufficient evidence to defeat

summary judgment on the issue of whether she had an actual disability under the ADA where the

plaintiff testified that she took various pain medications, struggled to complete daily activities,

and took time off from work for medical appointments related to her pain, and the plaintiff's

testimony was corroborated by her physician).

Defendant also argues that Plaintiff did not have an actual disability after his surgery

because in April of 2017, Plaintiff's physician cleared him to return to work full duty without

restrictions and in May of 2017, Plaintiff stopped attending his physical therapy sessions because

he could not afford the co-pay.  (Mot. at 14-15.)  In support of its argument, Defendant cites

*Parrotta v. PECO Energy Co.*, 363 F. Supp. 3d 577, 593 (E.D. Pa. 2019), in which a district

court found that the plaintiff did not have a disability at the time of the adverse employment

action.  (*See* Mot. at 14-15.)  Defendant is mistaken.

"[T]he determination of whether a person was a 'qualified individual with a disability'

for the purposes of an ADA claim is not made from the time the lawsuit was filed or any other

later time period, but from the point at which the alleged discriminatory decision was made."

*Bowers v. NCAA*, 475 F.3d 524, 535-536 (3d Cir. 2007).  Defendant terminated Plaintiff's employment on December 14, 2017.  On December 5, 2017, a little over a week before Plaintiff's termination, Plaintiff visited his primary care physician for his pain.  (December 5, 2017, Progress Note at Collegeville Family Practice.)  Unlike the plaintiff in *Parrotta*, Plaintiff has provided medical documentation, contemporaneous with his termination, that supports his testimony that, at the time he was terminated, he was under the care of a physician for his pain, he was taking pain medications, and he was actively experiencing limitations due to pain.  (*Id*.) Plaintiff has also provided medical documentation that supports his testimony regarding the nature and duration of his pain and his many attempts to ameliorate it leading up to his termination.  (March 8, 2017, MRI; Progress Notes at Collegeville Family Practice; NovaCare Rehabilitation appointment summaries.)

Defendant next argues that Plaintiff did not have an actual disability because he continued to perform his job duties for Defendant in spite of the pain.  (Mot. at 14-15.) Defendant is simply wrong.  "[I]n determining whether [a plaintiff] qualifies as disabled under the ADA, the issue is not whether [the plaintiff] could perform the functions of her job, but whether [they] suffered from an impairment that substantially limited a major life activity." *Lindsey*, 2016 U.S. Dist. LEXIS 29180, at *16; *see also Eastman v. Research Pharm., Inc*., No. 12-2170, 2013 U.S. Dist. LEXIS 107935, at *26-33 (E.D. Pa. July 31, 2013) ("although plaintiff may have been able to drive and work, plaintiff put forth evidence from which a factfinder could reasonably conclude that these activities were more difficult for her as compared to most people in the general population because they caused her significant pain.  Accordingly, . . . I conclude that [plaintiff] has offered sufficient evidence to raise a genuine issue of fact as to whether she was disabled at the time she was terminated by [defendant].").

Lastly, Defendant argues that Plaintiff did not have an actual disability prior to his surgery because he would sometimes go weeks without pain.  (Mot. at 14.)  Defendant again is simply wrong.  "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."  42 U.S.C. § 12102(4)(D); *see also* 29 C.F.R. § 1630.2 (j)(1)(vii) (same); *see*, *e.g.*, *Eastman*, 2013 U.S. Dist. LEXIS 107935, at \*26-33 (holding that a plaintiff's back pain from a herniated disc was "not of an insignificant duration" under the ADA where the plaintiff "stated that her back pain would flare up for about a week a few times a year, for the past two or three years").

Having concluded that Plaintiff has put forth sufficient evidence to defeat summary judgment on the issue of whether he had an actual disability under the ADA, we need not discuss the other two definitions of disability under the ADA.

The third element of a *prima facie* case of disability discrimination is that the plaintiff suffered an adverse employment action that was the result of discrimination.  Although Defendant does not dispute that Plaintiff's termination was an adverse employment action, Defendant contests that Plaintiff was terminated as a "result of" disability discrimination.  (Mot. at 17.)  A plaintiff bringing a disability discrimination claim pursuant to the ADA must show that his disability was a "determinative factor" in the defendant's decision to terminate him.  *Decker v. Alliant Techs.*, *LLC*, 871 F. Supp. 2d 413, 428 (E.D. Pa. 2012) (citing *Watson v. SEPTA*, 207 F.3d 207, 214-15 (3d Cir. 2000)).

There is evidence in the record from which a reasonable jury could infer discriminatory animus toward Plaintiff on the basis of his disability.  For example, Plaintiff testified that he walked with a limp and that his supervisor, Voisine, mocked Plaintiff's limp.  (Plf.'s Dep. at 149-52.)  Plaintiff testified that he overheard Voisine say, "tell leg-boy to go do this, tell limpy to

go do this, tell back-man to go do this."  (*Id*. at 151.)

Plaintiff's medical documentation supports his testimony that he walked with a limp at times.  For example, at Plaintiff's September 14, 2016, appointment at Rothman, the physician noted Plaintiff's intermittent balance problems.  (September 14, 2016, Rothman appointment summary.)  Also, on April 12, 2017, in the NovaCare Rehabilitation appointment summary, the physical therapist noted that Plaintiff had a "[s]lightly antalgic gait pattern with decreased weight-bearing on R LE, decreased step length and decreased TKE on R."  (April 12, 2017, NovaCare Rehabilitation appointment summary.)  Further, on September 5, 2017, Plaintiff's primary care physician noted Plaintiff's difficulty walking.  (September 5, 2017, Progress Note at Collegeville Family Practice.)

However, Hughes, Morgan, and Payton III testified that they never saw Plaintiff limp.  (Hughes Dep. at 19; Payton III Dep. at 60-61; Morgan Dep. at 37.)  Fernandez and Rodriguez also swore in affidavits that they never saw Plaintiff walk with a limp.  (Fernandez Aff., ¶ 4; Rodriguez Aff., ¶ 10.)  Voisine was not questioned at his deposition about Plaintiff's limp or lack thereof.  Voisine was also not asked if he had mocked Plaintiff's limp.  This is a factual dispute.  We may not make the credibility determinations to resolve it.

Moreover, there is also evidence in the record from which a reasonable jury could infer that Plaintiff's medical situation did inform Defendant's decision to terminate Plaintiff.  Among Defendant's list of grievances against Plaintiff, for instance, are "prescriptions, doctors, etc." (Scott 2017 issues list.)  Zack swore in an affidavit that he overheard Voisine complain to other members of Defendant's management team about Plaintiff's time off for attending medical appointments and picking up prescriptions because Voisine and the other warehouse employees had to complete more work in Plaintiff's absence.  (Zack Aff., ¶ 11.)  Voisine's testimony that

Plaintiff's medical absences burdened him and other warehouse employees corroborates Zack's recollection.  (Voisine Dep. at 20, 24, 34-36, 44-45, 64.)  Accordingly, Plaintiff has established a *prima facie* case of disability discrimination under the ADA.

> 2.    *Legitimate, Nondiscriminatory Reason for Termination*

The burden now shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its action.  Under the *McDonnell Douglas* framework, the employer satisfies its "relatively light" burden of production by introducing evidence which, taken as true, would permit a conclusion that there was a legitimate, nondiscriminatory reason for its employment decision. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  The employer need not prove that the proffered reason actually motivated the termination decision, because "throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.*

Defendant has satisfied its "relatively light" burden by proffering numerous infractions allegedly committed by Plaintiff: arriving late, leaving early, taking long lunches, exceeding allotted PTO, not performing tasks as directed, theft of employer property, driving forklift too fast, and discharging a handgun at a tree stump in back of the warehouse.  Defendant also proffered that Plaintiff "was the cause of the discord in the warehouse."  (Mot. at 18.) Ultimately, Defendant contends it terminated Plaintiff because "he refused to acknowledge the problems he was causing and agree to change his behavior."  (*Id.*)  An employer is permitted to discharge an employee for misconduct, "even if that misconduct is related to [the employee's] disability." *Hoffman v. City of Bethlehem*, 739 F. App'x 144, 149 (3d Cir. 2018) (citing 42 U.S.C. § 12113(a), (b); 29 U.S.C. § 794(d)).

20

3.      *Pretext*

At the final stage of the analysis, "the burden shifts back once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual." *Willis*, 808 F.3d at 644.  To meet this burden, a plaintiff must identify evidence from which a reasonable jury could either "disbelieve or discredit the employer's justification" or "believe discrimination was more likely than not a 'but for' cause of the adverse employment action." *Abels v. Dish Network Serv., LLC*, 507 F. App'x 179, 183 (3d Cir. 2012) (citing *Fuentes*, 32 F.3d at 764).

To establish pretext under the first prong, Plaintiff must do more than "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765.  Instead, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id*. (internal citations and quotation marks omitted).  Plaintiff has demonstrated inconsistencies and implausibilities sufficient to establish pretext under the first prong.

Plaintiff correctly argues that there are several inconsistencies in the record regarding the timing of Defendant's asserted non-discriminatory reasons.  (Opp'n at 26-28.)  However, such inconsistencies could be reasonable as the witnesses are recalling events from a number of years ago.  For example, the timing of Plaintiff's behavioral decline is unclear based on the record as a whole.  Payton III claimed that the warehouse drama began as early as 2016 and that Plaintiff

21

was addressed at his 2016 annual performance review meeting about it.  (Payton III Dep. at 20, 33.)  Payton III also claimed that Plaintiff's 2016 bonus was not increased as a result.  (*Id.* at 33.) According to Defendant's payroll records, Plaintiff received the same size bonus in 2016 as he had received in 2014 and 2015.  (Plf.'s Payroll Records.)  However, Morgan did not make a handwritten note of this concern on Plaintiff's 2016 performance review.  (Plf.'s 2016 performance review.)  Payton III also testified that the warehouse drama petered out when Plaintiff went on his post-surgery leave of absence and then resurfaced when Plaintiff returned to work in April of 2017.  (Payton III Dep. at 37.)

However, Plaintiff and Voisine testified that the interpersonal issues in the warehouse did not begin until Rodriguez was promoted to Warehouse Manager in September of 2017.  (Voisine Dep. at 51-53; Plf.'s Dep. at 82-83.)  In contrast, Hughes and Morgan testified that Plaintiff's behavior began to decline in May or June of 2017.  (Hughes Dep. at 14, 20; Morgan Dep. at 39, 45.)  Additionally, Morgan's letter to the Unemployment Office asserts a different time as the start for Plaintiff's behavioral issues:  early 2017.[3]  (Morgan's February 6, 2018, letter to Unemployment Office.)  In contrast, Zack swore he never observed any decline in Plaintiff's behavior at work.  (Zack Aff., ¶ 18.)

Additionally, Plaintiff's role in the warehouse drama is also unclear in the record. Plaintiff and Voisine testified that Zack resented Rodriguez and Voisine because Zack was passed over for the Warehouse Manager position.  (Plf.'s Dep. at 82-83; Voisine Dep. at 51-53.) Plaintiff's 2017 performance review acknowledges interpersonal drama occurring in the warehouse between Zack, Voisine, and Rodriguez.  In reference to the discord, Plaintiff wrote

---

[3] Although Morgan's letter references an attached list, no attachment was included in the record.

that "[w]e need better communication in the warehouse. This lack of communication hurts our efficiency and it needs to be worked on by everyone. . . . We need to improve the morale and the teamwork of the warehouse employees. The negativity and selfishness is dragging everyone down." (Plf.'s Dep. at 85-86; Plf.'s 2017 performance review.) Plaintiff testified that he was not involved in the warehouse drama. According to Plaintiff, "You come there to work. You put your personal issues aside. Work is you come in to work to work. You get paid to work. I came in. I did my job. I communicated with whoever I needed to communicate with to do my job." (Plf.'s Dep. at 84.)

However, Payton III, Hughes, and Rodriguez claimed that Plaintiff was in fact the source of the discord, (Rodriguez Aff., ¶ 7; Payton III Dep. at 37; Hughes Dep. at 35), whereas Morgan testified that in addition to Plaintiff and Zack, Fernandez was also responsible for the discord. (Morgan Dep. at 52-53.) To add to the confusion, according to Coniglio, *all* the warehouse employees were embroiled in the warehouse drama. (Coniglio Dep. at 31-32.) In July or August of 2017, Coniglio started hearing from Rodriguez and Voisine that "[p]eople in the warehouse [were] not cooperating with each other, not working together, people [were] leaving early from their scheduled times, people [were] not actually doing their duties, whether it be, you know, just regular requests from supervisors and so on." (*Id*. at 31-32.) According to Coniglio, Voisine did not say that one person was at fault; rather, Voisine blamed everyone. (*Id*. at 31-32.) Per Coniglio, "all of them were, 'I'm not helping him with this, I got that, I got this job.' It was just all this kind of stuff, which we had never had before." (*Id*. at 39.)

When Plaintiff began exceeding his allotted PTO days is also unclear in the record. Morgan testified that, before surgery, Plaintiff's only issue in 2016 was exceeding his allotted

PTO days.  (Morgan Dep. at 27-28, 39, 45.)  However, Voisine testified that Plaintiff had been

exceeding his allotted PTO days since 2013. (Voisine Dep. at 21-22.)

There are also inconsistencies in the record regarding the manner in which Plaintiff called

out of work.  (Opp'n at 28-29.)  Morgan claims that Plaintiff would call and speak to Rodriguez

and Voisine.  (Morgan Dep. at 29-30.)  However, Voisine claims that Plaintiff would never call

him directly; rather, Plaintiff would call or email Coniglio, Payton III, or Hughes.  (Voisine Dep.

at 20-21.)  Sometimes Plaintiff would also copy Voisine on these emails.  (*Id*. at 21.)  None of

these emails were included in the record.

There is also a dispute in the record regarding the reasons for Plaintiff's time off from

work.  (Opp'n at 28-29.)  Morgan claimed Plaintiff's reasons for taking time off were various:

"Not feeling well.  He seemed to have numerous grandmothers who died, he was losing relatives

left and right.  The doctors' appointments -- not doctors' appointments.  Just not feeling well.

We had a number of cases."  (Morgan Dep. at 29, *see also* 32.)  According to Morgan, Plaintiff

did not mention he was taking the time off because of a back condition.  (*Id*. at 32.)  Fernandez

swore that Plaintiff would often leave early for "different excuses, . . . none of which pertained to

any purported problem with his back."  (Fernandez Aff., ¶ 9.)  In contrast, Plaintiff claims he

took time off from work because of pain caused by his herniated disc and scar tissue, medical

appointments, physical therapy, and prescriptions.  The only documentation in the record of

Plaintiff taking time off from work is a 2013 email chain between Plaintiff and Defendant's

management team.  The reason for the time off was epidural injections for "terrible back pains."

(October 2013 email chain.)

Based solely on the record before us, it is also unclear why Defendant's management

team waited to discipline or terminate Plaintiff for some of the alleged infractions.  Payton III,

Voisine, and Morgan testified that Plaintiff's unsafe operation of the forklifts was one of the issues of concern at the time of his termination.  However, they testified that they had been concerned *for years* about Plaintiff's unsafe operation of the forklifts.  (Payton III Dep. at 18; Voisine Dep. at 36; Morgan Dep. at 51.)  Indeed, on Plaintiff's 2013 performance review, Morgan handwrote "*DRIVE FORKLIFTS SLOWER*."  (Plf.'s 2013 performance review.) Morgan, Coniglio, and Payton III also testified that Plaintiff's discharge of a handgun at a tree stump in the back of the warehouse was another issue of concern at the time of his termination. (Payton III Dep. at 52-53; Morgan Dep. at 63-64; Coniglio Dep. at 21-23; *see also* Scott 2017 issues list.)  However, it is unclear why management did not discipline or terminate Plaintiff when they first learned of the handgun incident in 2016.  (Morgan Dep. at 64-65; Payton III Dep. at 52-53; Voisine Dep. at 58-60; Coniglio Dep. at 21-23.)  Additionally, according to Voisine, Plaintiff had been exceeding his annual allotted PTO days since 2013, (Voisine Dep. at 20), and yet, Plaintiff was not disciplined for his excessive PTO until December of 2017.

Additionally, it is odd that Defendant was not able to provide either the specific dates of Plaintiff's attendance infractions or supporting documentation.  Although Morgan was responsible for tracking employee attendance, Morgan could not provide any specific dates for Plaintiff's alleged attendance infractions.  (Morgan Dep. at 9, 30-33, 58-60; *see also* Payton III Dep. at 45-46.)  Morgan also did not handwrite any notes regarding PTO on any of Plaintiff's performance reviews from 2010 through 2016.  (Plf.'s 2010 - 2016 performance reviews.)  There is only one note on Plaintiff's 2017 performance review on this subject: "– Days out – Leave early."  (Plf.'s 2017 performance review.)  Although Voisine and Payton III testified that Defendant had a computer system for logging attendance, the record does not include any archives of Plaintiff's attendance infractions from this system.  (Voisine Dep. at 19, 56; Payton

25

III Dep. at 45-46.)  Although Voisine and Morgan testified that there were numerous email chains documenting Plaintiff's attendance infractions, none were included in the record. (Voisine Dep. at 20-21, 49-50; Morgan Dep. at 41, 46, 48-49.)  There is only one email chain in the record documenting a "call out" by Plaintiff, which was for a medical reason: epidural injections for "terrible back pains" in October of 2013.  (October 2013 email chain.)  According to Plaintiff, even at the time of both the October 5, 2017, meeting and his 2017 annual performance review meeting, Defendant's management team could not provide the specific dates of Plaintiff's alleged attendance infractions.  (Plf.'s Dep. at 92-94, 97, 114-15.)

Defendant also claims that another issue of concern at the time of termination was that Plaintiff had exceeded his allotted PTO days.  According to Morgan, Plaintiff would have been allotted a total of 20 PTO days per year.  (Morgan Dep. at 28-29, 31.)  Voisine and Payton III testified that in 2017, Plaintiff exceeded his PTO days by only one day.[4]  (Voisine Dep. at 56; Payton III Dep. at 51-52; *see also* Scott 2017 issues list.)  It is unclear why Defendant's management team was so alarmed by this when, according to Payton III, the management team did not normally address PTO issues unless the employee was "grossly over."  (Payton III Dep. at 16.)

There are also numerous factual disputes surrounding Defendant's other proffered reasons for terminating Plaintiff's employment.  On a motion for summary judgment, we may not make the credibility determinations necessary to resolve these factual disputes:

- On one occasion, date unknown, Plaintiff allegedly did not leave the coils in the coating tank for enough time.  (Fernandez Aff., ¶ 10; Rodriguez Aff., ¶ 6; Scott 2017 issues list; Coniglio Dep. at 36; Morgan Dep. at 50, 75-76.)  Plaintiff denies having done this.  (Plf.'s Dep. at 120-21.)  Morgan claimed there is an email

---

[4] During his post-surgery medical leave of absence, Plaintiff had used only two weeks of PTO.  (Scott 2017 issues list.)  For the remainder, he received less than his full salary through a private short-term disability insurance policy.  (Plf.'s Dep. at 159-60.)

memorializing this incident.  (Morgan Dep. at 50.)  No such email was included in the record.

- On one occasion, in the fall of 2017, Plaintiff allegedly did not move coils when instructed by Fernandez.  (Fernandez Aff., ¶ 11; Rodriguez Aff., ¶ 6.; Coniglio Dep. at 36; Morgan Dep. at 49; Voisine Dep. at 43-44.)  Plaintiff denies this happened.  (Plf.'s Dep. at 111-12.)  Morgan claimed there is an email memorializing this incident.  (Morgan Dep. at 50.)   Such an email was not included in the record.

- Plaintiff allegedly disappeared during the workday on multiple occasions, dates unknown.  (Voisine Dep. at 43-44, 49.)  Plaintiff denies having done this.  (Plf.'s Dep. at 93.)  No documentation was provided regarding Plaintiff's alleged disappearances.

- On one occasion, date unknown, Plaintiff allegedly stole a nail gun.  According to Plaintiff, it was in fact Rodriguez who left the missing nail gun on the back of a truck.  (Id. at 95.)

- On one occasion, date unknown, Plaintiff allegedly stole 2-by-4s.  According to Plaintiff, it was in fact Fernandez who took the missing 2-by-4s to complete a home project.  (Id. at 97-98.)

- On one occasion, date unknown, Plaintiff allegedly stole a number of straps. (Morgan Dep. at 62.)  Plaintiff denied having done this.  (Id. at 62.)  Although Morgan testified that there was an email documenting the missing straps, no such email was included in the record.  (Id. at 63.)

- On multiple occasions, dates unknown, Plaintiff allegedly shut down the coating tank a half hour early.  According to Plaintiff, it was in fact Fernandez who was assigned to the coating tank and who had been shutting down the coating tank a half hour early.  (Plf.'s Dep. at 98-99.)

- On multiple occasions, dates unknown, Plaintiff allegedly did not pull orders late in the day.  (Voisine Dep. at 40-42, 49; Scott 2017 issues list.)  Plaintiff responds that he was not aware of the late orders because Voisine, on purpose, would drop them in the box without telling him.  (Plf.'s Dep. at 95.)  Zack's affidavit corroborates Plaintiff.  (See Zack Aff., ¶ 14 ("I also witnessed Voisine purposely wait to bring orders down from the office until the very end of the day so that Hanlon would have to pull the orders alone.").)

- On multiple occasions, dates unknown, Plaintiff allegedly exceeded his thirty-minute lunch break.  (Payton III Dep. at 36-37; Voisine Dep. at 36-37; Rodriguez Aff., ¶ 5; Scott 2017 issues list.)  Voisine did not document the times that Plaintiff exceeded his lunch break.  (Voisine Dep. at 39.)  Zack swore in an affidavit that "Hanlon and I never took full lunches because we would stop eating and complete

tasks during our allotted lunch time." (Zack Aff., ¶ 15.)  Plaintiff wrote in his 2011 and 2012 performance reviews that he barely takes a lunch break. (Plf.'s 2011 - 2012 performance reviews.)  Plaintiff testified that 80% of the time he worked through his lunch break.  (Plf.'s Dep. at 93.)

Interestingly, Zack swore in an affidavit that, in his opinion, "Voisine went out of his way to harass Hanlon in an effort to cause him to quit.  Voisine frequently blamed things on Hanlon that were not Hanlon's fault.  For example, if there was a problem in the warehouse, Voisine would automatically blame the problem on Hanlon without investigating who was at fault." (Zack Aff., ¶ 12.)

In any event, Plaintiff has presented sufficient evidence to satisfy the second prong as well.  Under the second prong, a plaintiff may establish pretext by demonstrating "that the employer treated other, similarly situated persons not of his protected class more favorably." *Fuentes*, 32 F.3d at 765.  With regard to discipline in the workplace, the relevant factors to consider in determining whether individuals are "similarly situated" may include a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *McCullers v. Napolitano*, 427 F. App'x. 190, 195 (3d Cir. 2011) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)).

Plaintiff has shown that Fernandez and Zack, full-time Warehouse Workers who also reported to Voisine and Rodriguez, had engaged in similar conduct but were not terminated. Although Fernandez discharged a handgun behind Defendant's warehouse, (Fernandez Aff., ¶ 12; Coniglio Dep. at 45-46; Payton III Dep. at 53), exceeded his allotted PTO days in 2017, (Voisine Dep. at 50), left early, (Hughes Dep. at 36; Coniglio Dep. at 32), and played a role in the warehouse drama, (Morgan Dep. at 24), he was not terminated by Defendant.  (Coniglio Dep.

at 14; Morgan Dep. at 11; Fernandez Aff., ¶ 1.)  Also, although Zack played a role in the warehouse drama, (Morgan Dep. at 24; Hughes Dep. at 37), he continued to work in Defendant's warehouse until his resignation in June of 2018.  (Zack Aff., ¶ 2; Voisine Dep. at 51-53; Coniglio Dep. at 14.)

Defendant explains that these Warehouse Workers were treated differently because they acknowledged their inappropriate behavior and promised to correct it.  (*See* Morgan Dep. at 67-68; Payton III Dep. at 57; Hughes Dep. at 36-37.)  To ensure that Zack and Fernandez indeed corrected their behavior, Defendant paid out their 2017 bonuses gradually.  (Payton III Dep. at 57; Coniglio Dep. at 44; Hughes Dep. at 36-37; Morgan Dep. at 23-24, 67-68.)

However, Plaintiff contends that these Warehouse Workers were treated differently because they had never taken time off for medical reasons.  (*See* Morgan Dep. at 81.)  The suggestion in the record that Plaintiff was not even offered an incremental bonus appears to support Plaintiff's contention.  (Coniglio Dep. at 44; Morgan Dep. at 23-25.)

After a thorough review of the record, we are satisfied that summary judgment is not appropriate here.  We will therefore deny Defendant's Motion as to the disability discrimination claims under the ADA and the PHRA.

    **B.**    **Failure to Accommodate and Failure to Engage in the Interactive Process under the ADA and the PHRA (Counts I and III)[5]**

Under the ADA, an employer has a duty to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee," unless the employer "can demonstrate that the accommodation would impose

---

[5] "[F]ailure to accommodate claims do not require that an employer's action be motivated by a discriminatory animus directed at the disability and, therefore, the *McDonnell Douglas* test does not apply."  *Reyer v. Saint Francis Country House*, 243 F. Supp. 3d 573, 595 (E.D. Pa. 2017) (internal citations and quotation marks omitted).

an undue hardship on the operation of the business."  42 U.S.C. § 12112(b)(5)(A).  "The employer can breach this duty by failing to provide an accommodation that is reasonable or by failing to engage in a good faith interactive process to identify accommodations."  *Lewis v. Univ. of Pa.*, 779 F. App'x 920, 923 (3d Cir. 2019).  "The interactive process does not dictate that any particular concession must be made by the employer; nor does the process remove the employee's burden of showing that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions.  All the interactive process requires is that employers make a good-faith effort to seek accommodations."  *Taylor*, 184 F.3d at 317 (internal citation omitted).  "An employer may demonstrate good faith in various ways, including meeting with the employee, requesting information about the employee's condition and limitations, asking what the employee wants, showing signs of having considered the employee's request, and offering and discussing available alternatives when the request is too burdensome."  *Sessoms v. Trs. of the Univ. of Pa.*, 739 F. App'x 84, 87-88 (3d Cir. 2018).

Reasonable accommodations may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."  42 U.S.C. § 12111(9).  Plaintiff alleges that Defendant failed to accommodate him and failed to engage in the interactive process.  Plaintiff's Amended Complaint alleges that Plaintiff requested the following accommodations to alleviate the stress on Plaintiff's back: (1) installation of suspension seats on the forklifts; and (2) an office chair

with lumbar support.[6]  (Am. Compl., ¶¶ 13-14.)

In support of its Motion, Defendant first argues that Plaintiff did not have a disability under the ADA.  (Mot. at 21-22.)  We have already rejected this argument in our analysis of Plaintiff's disability discrimination claims.

Defendant next argues that it did not know Plaintiff had a disability until he requested a leave of absence for surgery.  (Mot. at 22.)  According to Coniglio, Hughes, Morgan, and Payton III, they first learned that Plaintiff had any back issues at the 2016 annual performance review meeting when Plaintiff advised them that he had an upcoming surgery and he requested a leave of absence of a couple of months.  (Coniglio Dep. at 24-25; Hughes Dep. at 17-18; Payton III Dep. at 27; Morgan Dep. at 35.)

"The employer must have enough information to know of 'both the disability and desire for an accommodation,' or circumstances must at least be sufficient to cause a reasonable employer to make appropriate inquiries about the possible need for an accommodation."  *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332 (3d Cir. 2003) (quoting *Taylor*, 184 F.3d at 313).

Plaintiff testified that he told individuals in Defendant's management about his herniated disc and resulting pain early on in his employment with Defendant.  During his job interview, Plaintiff told Coniglio that he had a herniated disc.  (Plf.'s Dep. at 23.)  During his first couple of years working for Defendant, Plaintiff also told his supervisor Voisine about his herniated disc.

---

[6] In our analysis of Plaintiff's failure to accommodate claims, we do not discuss Plaintiff's alleged request to return to work in March of 2017 with restrictions.  Defendant is correct that Plaintiff did not plead this accommodation request in the Amended Complaint. (Reply Br. at 5.)

(*Id*. at 24-25.)  Plaintiff also told Payton III multiple times about his herniated disc and his pain. (*Id*. at 30-32, 44-46.)

Payton III's testimony confirms these conversations.  Payton III testified that prior to being informed of Plaintiff's upcoming surgery, "I knew he was having back issues, but I didn't know it was serious, because he never complained, never -- it didn't bother his work, that I knew of.  So I didn't know to the extent how bad it was." (Payton III Dep. at 61.)  Moreover, Plaintiff provided an email chain between himself and Defendant's management team regarding Plaintiff's epidural injections for his "terrible back pains."  (October 2013 email chain.) Coniglio, Voisine, Hughes, and Payton III are on this email chain, as are Zack and Payton III's son, Payton IV, who was the Sales Manager.  (*Id*; *see also* Hughes Dep. at 11-12.)  This email chain is from October of 2013, well over three years before Plaintiff informed the management team of his upcoming surgery.  Thus, there is a factual dispute as to whether Defendant knew about Plaintiff's disability when he requested an office chair with lumbar support and suspension seats for the forklifts prior to his surgery.

Defendant also argues that, after the surgery, it did not know that Plaintiff was disabled because his physician had cleared him to return to work full duty without restrictions.  (Mot. at 23; *see* April 5, 2017, note from Rothman physician.)  This reasoning could preclude failure to accommodate/engage in the interactive process claims premised on Plaintiff's renewed request for suspension seats post-surgery; however, it would not preclude failure to accommodate/engage in the interactive process claims premised on Plaintiff's requests for suspension seats and an office chair with lumbar support prior to surgery.

In any event, there are indications in the record that Defendant's management team was aware of Plaintiff's post-surgery pain and ongoing medical treatment.  Payton III testified that,

after Plaintiff returned from surgery, Plaintiff told Payton III about his sciatica.  (Payton III Dep. at 62.)  Voisine's list documents his awareness that, after Plaintiff returned from surgery, Plaintiff took time off to attend medical appointments and pick up prescriptions.  (Scott 2017 issues list.)  Voisine also testified that, during the spring of 2017, he knew that Plaintiff was attending physical therapy "for some kind of pain in his leg."  (Voisine Dep. at 45.)  According to Voisine, he and Rodriguez managed the schedule so that Plaintiff could attend these physical therapy appointments.  (*Id.*)  Fernandez also swore in an affidavit that, after Plaintiff's surgery, he observed Plaintiff complaining of discomfort from operating the forklift.  (Fernandez Aff., ¶ 6.)  Thus, there is also a factual dispute as to whether Defendant knew about Plaintiff's disability when he requested suspension seats for the forklifts after his surgery.

Defendant next argues that Plaintiff's failure to accommodate/engage in the interactive process claims fail because, although Plaintiff experienced pain, he was not entitled to an accommodation because he continued to perform his job duties without any accommodation. (Mot. at 23.)  Plaintiff testified that due to his herniated disc and scar tissue, he experienced severe pain from performing his job duties.  In spite of the pain, he continued to perform his job duties without the requested accommodations because, according to Plaintiff, "I had to.  I had bills.  I needed to make a paycheck."  (Plf.'s Dep. at 74.)

In its Reply, Defendant cites to a Seventh Circuit decision affirming a Rule 12(b)(6) dismissal of a failure to accommodate claim.  (Reply Br., ECF No. 17, at 4-5.)  The Seventh Circuit in *Brumfield v. City of Chi.*, 735 F.3d 619, 632-33 (7th Cir. 2013), held that the ADA does not require an employer to accommodate a disability that is "irrelevant to" or "ha[s] no bearing on an employee's ability to perform the essential functions of [the] job."  The Seventh Circuit noted that the complaint did not assert how any of the plaintiff's job duties were impacted

by her alleged psychological issues.  The Seventh Circuit also noted that the complaint alleged

that "four psychological examinations [had] determined that [the plaintiff] was fit for duty as a

police officer."  *Brumfield*, 735 F.3d at 633.

  Here, it is undisputed that in order to complete his job duties in Defendant's warehouse,

Plaintiff sat at a desk and in a forklift for extended periods of time.  The office chair and forklift

seat were flat, and the warehouse floor was rough with potholes.  Plaintiff testified that

prolonged sitting under these conditions aggravated his herniated disc and scar tissue, causing

him to experience pain.[7]  (Plf.'s Dep. at 24, 26, 28, 29, 46-47, 52, 55.)  Plaintiff also testified that

at times the pain was so severe that he could not even get out of bed in the morning to report to

work.  (*Id*. at 21, 57.)  When Plaintiff called out, other employees had to perform his job duties.

(Voisine Dep. at 20, 44-45.)  Plaintiff also provided supporting medical documentation

confirming his herniated disc and scar tissue, and his resulting pain and physical limitations.

(March 8, 2017, MRI (noting scar tissue); September 14, 2016, Rothman appointment summary,

Progress Notes at Collegeville Family Practice (noting herniated disc and 2015 MRI findings),

NovaCare Rehabilitation appointment summaries.)  Thus, unlike the plaintiff in *Brumfield*,

Plaintiff's disability was not "irrelevant to" his performance as a Warehouse Worker.  *Compare*

*Luckett v. Dart*, No. 14-6089, 2017 U.S. Dist. LEXIS 124311, at *28-32 (N.D. Ill. Aug. 7, 2017)

(noting *Brumfield* but nevertheless rejecting the defendant's argument that the plaintiff's

continued performance of his job duties as a correctional officer without an accommodation

precluded his failure to accommodate claim because the plaintiff's statements, supported by

medical documentation, showed that his PTSD made it more difficult for him to supervise

---

[7] Due to the potholes, Zack would also experience "severe jolts to [his] body" while
operating the forklift in Defendant's warehouse.  (Zack Aff., ¶ 8.)

inmates, that he was under the care of a psychiatrist, and that he was taking psychotropic medication) *with Beishl v. Cnty. of Bucks*, No. 18-2835, 2018 U.S. Dist. LEXIS 216551, at *9 (E.D. Pa. Dec. 27, 2018) (noting *Brumfield* and finding that the plaintiff was not entitled to an accommodation because the complaint alleged how the esophageal achalasia affected the plaintiff's ability to sleep, eat, and digest food, but not how it affected the plaintiff's ability to perform his job duties as a groundskeeper).[8]

We note that in 1998, the Third Circuit articulated that an employee who can perform the essential functions of the job without accommodation "is qualified (and, *a fortiori*, is not entitled to accommodation.)" *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 146 (3d Cir. 1998). Referencing this statement from *Deane*, a district court in our Circuit entered summary judgment in favor of an employer on a failure to accommodate/engage in the interactive process claim, stating that "[w]hen an employee, as here, can manage and overcome her limitations with minor effort, she does not require an accommodation for purposes of the ADA." *Colonna v. UPMC Hamot*, No. 16-0053, 2017 U.S. Dist. LEXIS 155827, at *25-27 (W.D. Pa. Sep. 25, 2017).

However, the Third Circuit's statement in *Deane* is not controlling here. The Third Circuit in *Deane* did not consider whether the pain an employee experiences from performing essential job functions, unmitigated by medical interventions, would have an impact on the employee's entitlement to a reasonable accommodation. Additionally, the district court's

---

[8] In its reply, Defendant also cites to *St. Cyr v. Brandywine Senior Living, LLC*, No. 10-5868, 2012 U.S. Dist. LEXIS 85426, at *25 (D.N.J. June 20, 2012). *St. Cyr* is not analogous to the instant matter. *St. Cyr* involved a failure to accommodate claim under the New Jersey Law Against Discrimination ("NJLAD"). The court determined that the plaintiff was not handicapped within the meaning of the NJLAD, the plaintiff did not provide any supporting medical documentation for her alleged handicap, the plaintiff testified that medication resolved the pain she experienced walking, and the plaintiff had never requested any accommodation.

decision in *Colonna* is not analogous to the instant matter because the plaintiff in *Colonna* could

arrive on time for her shift if she simply woke up thirty minutes earlier and applied eye drops.

*Colonna*, 2017 U.S. Dist. LEXIS 155827, at *26.  Here, Plaintiff testified that a herniated disc

and scar tissue caused him to experience severe pain from performing his job duties.  Plaintiff

attempted to mitigate this pain on his own with medication, physical therapy, acupuncture,

epidural injections, and even surgery—to no avail.

 The D.C. Circuit has held that "[a] reasonable jury could conclude that forcing [an

employee] to work with pain when that pain could be alleviated by his requested accommodation

violates the ADA."  *Hill v. Assocs. for Renewal in Educ.*, 897 F.3d 232, 239 (D.C. Cir. 2018);

*see also Marshall v. Fed. Exp. Corp.*, 130 F.3d 1095, 1099 (D.C. Cir. 1997) ("We assume

without deciding that if working conditions inflict pain or hardship on a disabled employee, the

employer fails to modify the conditions upon the employee's demand, and the employee simply

bears the conditions, this could amount to a denial of reasonable accommodation, despite there

being no job loss, pay loss, transfer, demotion, denial of advancement, or other adverse

personnel action.").

 Similarly, the Sixth Circuit rejected an employer's argument that "if [the employee] was

physically capable of doing his job—no matter the pain or risk to his health—then it had no

obligation to provide him with any accommodation, reasonable or not."  *Gleed v. AT&T Mobility*

*Servs., LLC*, 613 F. App'x 535, 538-39 (6th Cir. 2015); *see also Kessler v. AT&T*, No. 13-207,

2015 U.S. Dist. LEXIS 126888, at *36 (M.D. Pa. Sep. 22, 2015) (explicitly following *Gleed* and

"holding that there is a triable dispute of fact as to whether or not [the employer] failed to

provide [the employee] with reasonable accommodations, notwithstanding [the employee's] own

testimony that she was able to do her job.").  The Sixth Circuit relied on 29 C.F.R. 1630.2(o)(1),

which defines a reasonable accommodation as, *inter alia*, "[m]odifications or adjustments that enable a[n] . . . employee with a disability *to enjoy equal benefits and privileges of employment* as are enjoyed by [] other similarly situated employees without disabilities." (emphasis added). The Sixth Circuit interpreted the ADA's implementing regulations as requiring an employer to provide reasonable accommodations that will enable an employee with a disability to work"—as other employees do—without great pain." *Gleed*, 613 F. App'x at 539.

We will follow the guidance of the D.C. Circuit and the Sixth Circuit on this issue. Because Plaintiff experienced severe pain—unmitigated by medication, physical therapy, acupuncture, epidural injections, and surgery—when performing his job duties without the requested accommodations, there is a triable dispute of fact as to whether Plaintiff was entitled to a reasonable accommodation. We decline to embrace Defendant's rather callous perception of disability law: that an employee who is compelled financially to continue performing his job duties in pain, in spite of medical interventions, should have to grin and bear it even though a reasonable accommodation is available to alleviate his pain. Such a rule would set "a disturbing standard for determining whether an accommodation is reasonable. It may be that [an employee] could open the front door with great difficulty or make her way through the parking lot without falling each time, but should she have to? A paraplegic might be able to get out of her wheel chair and pull herself up a flight of stairs as well, but that does not mean an employer may refuse to install a ramp or an elevator on that ground." *Sturz v. Wis. Dep't of Corr.*, 642 F. Supp. 2d 881, 887-88 (W.D. Wis. 2009); *see also Muovich v. Raleigh Cnty. Bd. of Educ.*, 58 F. App'x 584, 591 (4th Cir. 2003) ("We see no reason to penalize a plaintiff who is willing to continue working, despite substantial discomfort and the risk of worsening—and possibly permanent—injury, when her employer refuses to provide a reasonable accommodation.").

Defendant also argues that Plaintiff was not entitled to an accommodation after his surgery because his physician cleared him to return to work full duty without any restrictions. (Mot. at 23; *see* April 5, 2017, note from Rothman physician.)  Again, this reasoning could preclude failure to accommodate/engage in interactive process claims premised on Plaintiff's renewed request for suspension seats post-surgery, but it would not preclude failure to accommodate/engage in the interactive process claims premised on Plaintiff's requests for suspension seats and an office chair with lumbar support prior to the surgery.  However, as noted above, regardless of the medical clearance Plaintiff received in April of 2017, afterward, Plaintiff was attending physical therapy sessions and medical appointments and picking up prescriptions for sciatica caused by scar tissue.

Defendant also argues that Plaintiff did not request an accommodation.  (Mot. at 22.)  Plaintiff asserts that he did.  "What matters under the ADA are not formalisms about the manner of the request, but whether the employee . . . provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation."  *Drozdowski v. Northland Lincoln Mercury*, 321 F. App'x. 181, 185 (3d Cir. 2009).  Essentially, "[a]n employee must say or do something to put her employer on notice that she would like to be accommodated at work."  *Arana v. Temple Univ. Health Sys*., 776 F. App'x 66, 71 (3d Cir. 2019).

Plaintiff testified that on multiple occasions he asked Voisine, Coniglio, and Payton III for suspension seats.  (Plf.'s Dep. at 26-31, 45-46, 122-24.)  Plaintiff also testified that, prior to and after surgery, he provided Coniglio with a supplier catalog and marked the page on suspension seats, valued at $349.99 each.  (*Id*. at 26, 29, 76-77.)  Plaintiff further testified that, prior to and after surgery, he arranged for the supplier PA Industrial to fax Voisine written

quotes for the suspension seats, again valued at $349.99 each.[9]  (*Id*. at 26-27, 31, 45-47, 75-77.)

According to Plaintiff, in response, Voisine "ridiculed me, told me I had no business buying

anything, when I wasn't buying anything.  He gave me kickback, ignored me, and told me no."

(*Id*. at 27.)  Plaintiff testified that he confided in Zack that he had made these accommodation

requests to management. (*Id*. at 29.)  Zack confirmed in his affidavit that "[Plaintiff] informed

me that he had requested suspension seats for the forklifts and had provided quotes to

Defendant's management." (Zack Aff., ¶ 9.)  Plaintiff also testified that, prior to surgery, on

multiple occasions he asked Voisine, Coniglio, Payton III, Hughes, and Morgan for an office

chair with lumbar support.  (Plf.'s Dep. at 52.)  In Plaintiff's annual performance reviews from

2010 through 2017, Plaintiff did not mention that he desired a suspension seat or office chair

with lumbar support.  (Plf.'s 2010 - 2017 performance reviews.)  According to Plaintiff, he did

not feel comfortable discussing his health issues in his annual performance reviews.  (Plf.'s Dep.

at 35-36, 55-56.)

     However, Voisine, Coniglio, Morgan, and Payton III testified that Plaintiff never made

these accommodation requests.  (Voisine Dep. at 25; Payton III Dep. at 58-60; Coniglio Dep. at

48-49; Morgan Dep. at 20, 36-37, 68.)   Also, Rodriguez and Fernandez swore in affidavits that

they were not aware of these accommodation requests.  (Rodriguez Aff., ¶ 10; Fernandez Aff., ¶

8.)  On summary judgment, we may not make the credibility determinations necessary to resolve

this factual dispute.  Whether Plaintiff ever requested suspension seats or an office chair with

lumbar support from Defendant is material to Plaintiff's failure to accommodate/engage in the

interactive process claims.  As there is a factual dispute on this material issue, Defendant is not

entitled to summary judgment on these claims.

---

[9] The quotes were not part of the record.

In sum, for the foregoing reasons, Defendant's Motion will be denied as to Plaintiff's failure to accommodate claims under the ADA and the PHRA.

**C.     Retaliation under the ADA and the PHRA (Counts II and IV)**

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual has made a charge . . . under [the ADA]."  42 U.S.C. § 12203(a).  Accordingly, "it is unlawful for an employer to retaliate against an employee based upon the employee's opposition to anything that is unlawful under the ADA."  *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003).

To make out a *prima facie* case of retaliation under the ADA, a plaintiff must show: "(1) protected employee activity, (2) adverse action by the employer either after or contemporaneous with the employee's protected activity, and (3) a causal relationship between the protected activity and the adverse employment action."  *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).  The burden-shifting framework of *McDonnell Douglas* also applies to ADA retaliation claims.  *Id*.

Plaintiff must first demonstrate that he engaged in a protected employment activity. Requesting an accommodation is a protected activity under the ADA's anti-retaliation provision. *See Shellenberger*, 318 F.3d at 191.  We have denied Defendant summary judgment on Plaintiff's failure to accommodate/engage in the interactive process claims.  As such, we assume for the moment that Plaintiff engaged in a protected employment activity when he requested suspension seats and an office chair with lumbar support.

Plaintiff also argues that his three-month post-surgery leave of absence and subsequent requests for time off for medical appointments and prescriptions were protected activities as

well.  (Opp'n at 34.)  "[T]he Third Circuit has suggested that, in some circumstances, a finite period of medical leave may represent a reasonable accommodation, if the leave 'would enable the employee to perform his essential job functions in the *near* future.'"  *Aspen v. Wilhelmsen Ships Serv.*, No. 13-6057, 2015 U.S. Dist. LEXIS 28849, at *13 (E.D. Pa. Mar. 9, 2015) (quoting *Conoshenti v. Public Serv. Elec. & Gas Co*., 364 F.3d 135, 151 (3d Cir. 2004) (emphasis added); *see also Cameron v. YRC, Inc*., No. 18-5022, 2020 U.S. Dist. LEXIS 25804, at *8 (E.D. Pa. Feb. 14, 2020) ("The intermittent time off sought by Plaintiff may constitute a reasonable accommodation.").

Plaintiff's post-surgery medical leave and subsequent time off for medical appointments and prescriptions were not indefinite or open-ended.  Plaintiff took three months off to recover from his surgery and then left early or came in late certain days to attend physical therapy and other medical appointments and to pick up prescriptions.  Plaintiff only attended physical therapy for a month because he could not afford the co-pay.  Therefore, we will consider Plaintiff's post-surgery medical leave and subsequent time off for medical reasons to be protected activity under the ADA as well.

Next, Plaintiff must prove that that he suffered an adverse employment action. Defendant does not dispute that Plaintiff's termination constituted an adverse employment action.

Finally, for a *prima facie* case of retaliation under the ADA, Plaintiff must demonstrate a causal connection between the protected activity and the adverse employment action.  In evaluating whether there is a causal connection between the protected activity and the adverse employment action, we consider "a broad array of evidence," such as "temporal proximity," "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated

41

reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007).

To begin, Defendant contests that there was a causal connection between Plaintiff's termination and his requests for a suspension seat and an office chair with lumbar support. (Mot. at 26.) Defendant argues that if Plaintiff first requested a suspension seat and office chair with lumbar support in 2010, then his termination seven years later is not unduly suggestive. (*Id.*) Defendant is mistaken. Plaintiff testified that he repeated his request for these accommodations numerous times throughout his roughly eight years of employment with Defendant. For instance, after returning from his three-month post-surgery leave of absence, Plaintiff testified that he renewed his request for suspension seats on the forklifts, just a few months before his termination. (Plf.'s Dep. at 161-62.)

Next, Defendant contests that there was a causal connection between Plaintiff's termination and his three-month post-surgery leave of absence and subsequent requests for time off for medical appointments and prescriptions. (Mot. at 26.) We disagree.

Plaintiff testified and Zack swore in an affidavit that Defendant's management team, in particular their supervisor Voisine, was displeased with the amount of time Plaintiff took off from work to recover from surgery, attend medical appointments, and pick up prescriptions. (Plf.'s Dep. at 53-54, 156-57; Zack Aff., ¶ 11.) Voisine documented these concerns in his list titled "Scott 2017 issues" when he wrote: "prescriptions, doctors, etc." (Scott 2017 issues list; Voisine Dep. at 54-55, 63-64; Payton III Dep. at 49-50.) Payton III, Hughes, Morgan, and Voisine's testimonies confirm that this was an issue of concern. (Voisine Dep. at 20, 63-64; Payton III Dep. at 46; Hughes Dep. at 21; Morgan Dep. at 29, 69, 84.) Voisine testified, "If

42

you're not working when you should be, you're putting on the burden to somebody else."
(Voisine Dep. at 64.)  According to Voisine, Plaintiff "wasn't pulling his own weight."  (*Id*. at
44.)

It is also noteworthy that throughout his employment with Defendant and as late as
December of 2016, just prior to advising the management team of his upcoming surgery,
Plaintiff was rated as a good employee.  (Hughes Dep. at 14, 20; Morgan Dep. at 39, 45.)
Suddenly, after returning from a three-month post-surgery leave of absence and after
subsequently taking time off for medical appointments and prescriptions, Defendant's
management team had numerous concerns about Plaintiff's behavior and attendance and
ultimately terminated him.  Plaintiff has demonstrated sufficient evidence of retaliatory animus
to defeat summary judgment on the issue of causation.  Plaintiff has established a *prima facie*
case of retaliation under the ADA.

Next, Defendant argues that it terminated Plaintiff's employment for a legitimate, non-
retaliatory reason: "Plaintiff had documented problems in the warehouse that he refused to
acknowledge, let alone correct, so [Defendant's] owner decided he had to terminate Plaintiff's
employment."  (Mot. at 26.)  Plaintiff responds that these alleged behavioral issues were
pretextual.  When we addressed Plaintiff's disability discrimination claims, we determined that
Plaintiff had presented sufficient evidence to defeat summary judgment on pretext and that there
were numerous factual disputes that precluded summary judgment.  Our conclusion applies with
equal force here.  As such, Defendant's Motion will be denied as to Plaintiff's retaliation claims
under the ADA and the PHRA as well.

## V.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment will be denied.

An appropriate Order follows.

                                        **BY THE COURT:**

                                        **_/s/ R. Barclay Surrick_**
                                        **R. BARCLAY SURRICK, J.**